RECEIVED

OCT 27 2010

*TONY R. MOORE, CLERK*
*WESTERN DISTRICT OF LOUISIANA*
*ALEXANDRIA, LOUISIANA*

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| **CAPITAL ONE, N.A.** | **CIVIL ACTION NO. 10-0665** |
| **-vs-** | **JUDGE DRELL** |
| **CITY OF ALEXANDRIA** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

Before the Court is the appeal of Capital One Bank ("Capital One"), from the Bankruptcy Court's April 1, 2010 grant of partial summary judgment in favor of the City of Alexandria ("the City"), recognizing the City's unencumbered ownership of certain immovable property in Alexandria and rejecting and terminating Capital One's claim to an interest in the property. Doc. 1-3.

For the reasons set forth, we affirm the Bankruptcy Court's ruling (i) that the City is the fee owner of the land and its improvements and (ii) its reinstatement of its own order deeming the lease rejected. However, we vacate the Bankruptcy Court order terminating the lease as an automatic result of its rejection. We are compelled to remand the case for further development of the record on that issue.

### BACKGROUND

**I. History of the lease and origins of the improvements**

The property affected is described in detail in Exhibit "A" of the Bankruptcy Court order. Doc. 1-3, pp. 5-9. It consists mainly of (i) a certain tract of land in Alexandria

surrounded roughly by Fourth Street, Jackson Street, Main Street, and Elliott Street, and (ii) various immovable improvements located there, particularly a disputed hotel tower and parking lot, formerly the Downtown Holiday Inn and today the Alexander Fulton Hotel. The property also contains various movables, the parties' interest in which is not at issue.

The City is the fee owner of the land. It had a long-term lease, originally dating from 1983, under which various lessees rented the property to operate a "full service hotel facility." Doc. 13-9. The hotel tower and parking lot were constructed by the original lessee, Alexandria Convention Centre, Ltd., pursuant to the 1983 lease, under which the parties agreed to construct a "landlord's project" and a "tenant's project" on the property, the latter consisting, in part, of the hotel tower and parking lot. Doc. 13-5, pp. 6-7. Alexandria Convention Center's interest in the property was transferred multiple times until the bankruptcy debtor here, NR Group, LLC (sometimes "NR" or "Debtor") acquired it and began operating the hotel in 2003.[1] In the interim, the original 1983 lease was amended numerous times, most notably in 1991,[2] 1996, and then in

---

[1] The chain of transfer is: (i) Alexandria Convention Centre, Ltd. to Hibernia National Bank, as Trustee for various lenders at a Sheriff's sale in 1987; (ii) Hibernia to Alexandria Hotel Property, Inc. in late 1987 / early 1988; (iii) Alexandria Hotel Property to RT Rapides Hotel Partnership in 1991; (iv) RT Rapides to Shaner Hotel Group Limited Partnership in 1996; and (v) Shaner to NR Group, Debtor, in 2003. *See*, Docs. 3-29 to 3-34, 12, p. 22, fn. 3 (citing to each conveyance document).

[2] The 1991 lease was the largest revision to the original lease. Indeed, though titled an amendment, the lease contained a merger clause that "[t]he terms and conditions set forth in this amended lease shall be the entire amended agreement," and these "supersede any and all terms and conditions as set forth in the original lease." Doc. 13-6, para 38. Whether the original lease was extinguished entirely thereby or only as to its contradictory terms is ambiguous. The merger clause is part of the last section of the amendment, after the provisions detailing the new terms of the lease between lessor and the new lessee, discussing instead the (lack of a) continuing relationship between lessor and the original

December 2003 when NR was assigned its interest and the City and NR entered into an Estoppel Agreement.[3]  Docs. 13-5 to 13-10.

At the same time NR assumed the lease, it granted a mortgage to Capital One in its interest in the property.  Doc. 3-35.  That it mortgaged its entire interest in the property is undisputed.  Rather, at issue is, first, what that interest encompassed - whether the Debtor owned and mortgaged an interest only in the leasehold, or in an interest that would survive the end of the lease - and second, whether the lease and/or any of that mortgage survive the Bankruptcy Court's *deemed* rejection of the lease.

## II. The Bankruptcy, including the order deeming the lease rejected (though not terminated)

In 2008 NR encountered financial difficulties.  It sought bankruptcy protection in November of that year.  Doc. 13-1.

Thereafter, through multiple joint and consensual filings before the Bankruptcy Court, the City and Capital One - and sporadically the Debtor - cooperated to allow the hotel to remain open during the bankruptcy process and to try to devise a long-term solution for the property.  So, in December 2008, on the City's motion, the parties agreed

---

lessee; specifically, it comes at the end of a long paragraph giving a litany of releases to the original lessee.  Ergo, it could only extinguish the original lessee from its responsibilities under that original lease - without such an explicit release, Louisiana law would still hold it liable to lessor even though all of its interests have been assigned to the new lessee.  Though this ambiguity was mentioned at the Bankruptcy hearing, as it was not argued explicitly by the parties here and as the Bankruptcy Court made no findings specific to it, we do not resolve it here.

[3]  Here, the 1983 lease and its amendments are referred to collectively as "the lease", with specific documents or amendments referenced where appropriate.  The status of the Estoppel Agreement vis-a-vis the present parties - one of whom is not a signatory to it - is discussed in Part II, Issue 2, below.

to allow a Court appointed Manager to operate the hotel, and, in part at the City's request, Capital One agreed to provide $300,000 of Debtor In Possession ("DIP") financing. *E.g.*, Docs. 13-37, 13-48.

One month later, in January 2009, the parties agreed to auction Debtor's interest in the property in February 2009. Doc . 3-4, p. 1, para. 2. This sale of Debtor's interest was already a remedy provided in the lease to protect NR's potential leasehold mortgagee,[4] and it would have allowed a new party to take over the lease subject to Capital One's mortgage. *E.g.*, doc. 13-6, p. 6. However, again at the City's request, the parties agreed to postpone the auction until September 2009 so the City could continue to operate the hotel over the summer, when several large conventions would be in town.[5] Docs. 3-7, 3-26, p. 7.

On June 30, 2009, the City moved the Bankruptcy Court to deem the lease rejected by operation of the Bankruptcy Code and to order Debtor to surrender the premises to the City. Doc. 13-52. Capital One initially objected that the City's motion (and particularly the exact relief it sought with regards to the lease) was "unclear." Doc. 3-55, p. 1. After a hearing the parties apparently came to an agreement, and two days later, on July 17, 2009, the Bankruptcy Court entered an order deeming the lease rejected, one

---

[4] Noting this, we do not hereby decide whether these protections were binding on the parties, or whether the lease's requirements for them to be operable were fulfilled or otherwise waived.

[5] We assume here the accuracy of Capital One's characterization of this particular behavior - that the City requested Capital One to postpone the auction - in part based on the City's description that Capital One "consent[ed] to suspend consideration of sales and auctions and to forego taking other action which of right it could have done under the Bankruptcy Code". Doc. 3-42, p. 5.

of the orders at issue here. Doc. 13-60. Crucially, this order did not say the lease was either canceled or terminated. It used neither of those words nor any of their synonyms; the only verb it used with regard to the lease was that it was "rejected." *Id*. On this basis, Capital One consented to the order, which was not appealed.

In the interim, on July 14, 2009, Capital One filed its initial proof of Claim against Debtor for more than $3,000,000. It asserted a mortgage in the leasehold and claimed as its security a mortgage in the ownership of the improvements. Doc. 3-12, pp. 1-2.

On September 16, 2009, the City filed an ex parte motion asking the Bankruptcy Court to order the Clerk of Court to cancel the lease in the public property record, "In furtherance of the operation of the Order [deeming the lease rejected] entered July 17, 2009." Doc. 13-63, p.3. Service of the motion was mailed the next day, causing Capital One to receive it two days after the motion was filed, on September 18, 2009. This was the same day the Bankruptcy Court granted the motion, before Capital One could oppose it. Docs. 3-9, 3-10, p. 8. However, Capital One quickly filed its objection, moving the next week for the Bankruptcy Court to stay its order and reconsider its decision. Doc. 13-66.

The Bankruptcy Court stayed its order and granted the motion to reconsider, ordering a hearing for October 14, 2009. Doc. 3-11. At the pretrial conference for that hearing the bankruptcy trustee did not appear, and the Bankruptcy Court advised the City to file an adversarial proceeding. Doc. 3-20, p. 7.

The City filed its complaint in the adversarial proceeding on October 29, 2009. Doc. 3-20. On November 10, 2009 the City filed an objection to Capital One's proof of

claim. Docs. 13-70, 13-76. The Bankruptcy Court promptly consolidated the two actions, both of which are thus before us here.  Doc. 13-73.

### III. The Present Proceeding

In its complaint, the City sought a declaratory judgment to quiet its title to the hotel property and improvements, asking the court to recognize its "absolute right to lease the hotel property to a new tenant free and clear of all liens and encumbrances." Doc. 3-20, p. 7.  In particular, it argued the following three points:

* first, that the recordation of the lease be canceled in the public record on the basis of the July 17, 2009 order deeming it rejected and Debtor's surrendering of possession of the demised premises;

* second and likewise, to declare that the Chapter 7 Trustee retains no marketable interest in the property; and

* third, that Capital One's leasehold mortgage be deemed canceled, or in the alternative, that the extent and validity of the mortgage be clarified so as to lift any cloud from the title.

Doc. 3-20, pp. 7-10.  Capital One answered, contesting all counts and asserting six affirmative defenses and various counterclaims, most notably those based on estoppel, unclean hands, and intentional or negligent misrepresentation.  Doc. 3-21, pp. 1-2.

The City sought summary judgment on the three counts on February 8, 2010. Capital One did not move for summary judgment on its counterclaims, though it did raise and argue its closely related affirmative defenses.

6

The Bankruptcy Court held a hearing on March 10, 2010, at which all parties appeared. The City and Capital One presented extensive arguments, particularly about the fee ownership issue, and the Bankruptcy Court entered oral findings. The transcript of that hearing is part of the Record here, referenced as Tr., doc. 3-44, p. XX.

On April 1,[6] 2010, the Bankruptcy Court entered its order granting summary judgment for the City on all three counts. Capital One appealed eight days later.

Capital One presents thirteen issues on appeal; the City presents four. Many of them are interrelated, whereby a decision in one is dispositive of the others. In particular, they all revolve around two major issues: one, whether Debtor owned and thus could mortgage a fee interest in the hotel tower and parking lot, or any other interest not contingent on the continued life and terms of the lease, and two, whether the lease was rejected and/or terminated. Capital One thus asks what, if any, are the parties' remaining rights and obligations under the lease. We group the parties' issues accordingly below, addressing them in their logical order under these two broad headings rather than seriatim.

As requested, in this appeal both parties filed briefs supplementing the arguments they had made to the Bankruptcy Court, incorporating their previous filings and the Bankruptcy Court record. Likewise, the exhibits from the original bankruptcy

---

[6] Capital One disputes this date, claiming it to be April 5. The April 1 date, to us, is clear. Doc. 3-45.

case, including the property's complete title abstract, are part of the Record.  We have reviewed and considered all of these documents in rendering our decision here.[7]

ANALYSIS

**I. Applicable Law**

*1. Federal jurisdiction, procedure, and choice of law*

Federal courts have jurisdiction over bankruptcy disputes by the Bankruptcy Clause of the U.S. Constitution and 28 U.S.C. § 1334(b), which vests federal courts with jurisdiction over proceedings "arising in or related to" a bankruptcy. *See, e.g., Eastover Bank for Sav. v. Sowashee Venture (In re Austin Dev. Co.)*, 19 F.3d 1077, 1084 (5th Cir. 1994) (hereinafter "*In re: Austin*").

The decision below was a grant of summary judgment.  We review such a decision *de novo. In Re Biloxi Casino Belle Inc.*, 368 F.3d 491, 496 (5th Cir. 2004) (citing *Williams v. Int'l Bhd. Of Elec. Workers, Local 520 [In re Williams]*, 298 F.3d 458, 461 [5th Cir. 2002]).

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *In re Biloxi Casino*, 368 F.3d at 496 (citing Fed. R. Civ. P. 56[c]; Bankr. R. 7056 [applying Rule 56 to adversary bankruptcy proceedings]).

---

[7]  In the first appellate briefs the parties claimed that there may have been an error, delay, or mistake - they and we are not sure which - in certifying the record.  As it consists mostly of filings from the prior case, both parties had access to all the relevant documents and referenced them ably in their briefs.  Neither party claims any resulting prejudice or continuing error, and we consider the issue settled.

The real property at issue is located in Louisiana, at least chronological versions of the lease contained a Louisiana choice of law clause, and all the relevant contracts, transactions, and actions were executed or occurred in Louisiana. The parties agree that Louisiana property and lease law governs the dispute, except where superceded by the Federal Bankruptcy Code or other federal law.

### 2. Louisiana law - the terms of a lease control

"The civil law lease is a contract firmly tied to the principles of obligations," Palmer, *Civ. Law of Lease in La.*, §1-1 (1997). Therefore, under the Louisiana Civil Code, the terms of a lease govern the rights and duties of the participants. Except with regard to certain fundamental principles - none of which are at issue here - the general provisions of the Civil Code on contracts and leases only apply residually, in the absence of an agreement by the parties to the contrary. As discussed by the Louisiana Supreme Court:

> In Louisiana, a lease is a synallagmatic contract . . . The lessor's and lessee's duties *ex contractu* are set forth in the parties' contract of lease; in Title IX of the Civil Code, *Of Lease*, art. 2669 et seq.; and in Title III of the Civil Code, *Obligations in General*, art. 1756 et seq. The Civil Code, however, while defining and governing the relationship of the parties to a lease, still leaves the parties free to contractually agree to alter or deviate from all but the most fundamental provisions of the Code which govern their lease relationship. . . . [T]he codal articles and statutes defining the rights and obligations of lessors and lessees are not prohibitory laws which are unalterable by contractual agreement, but are simply intended to regulate the relationship between the lessor and lessee when there is no contractual stipulation imposed in the lease.

*Carriere v. Bank of La.*, 702 So.2d 648, 665-666 (La. 1996) (internal citations omitted).

The present lease was comprehensive with regard to the issues in dispute here. Accordingly, our focus in the following is on the terms of the lease, including the 1983 lease and its amendments.

### 3. Other Louisiana substantive law

Under the Civil Code, buildings permanently attached to the ground "may belong to a person other than the owner of the ground." *Carriere*, 702 So.2d at 666. However, such buildings "are presumed to belong to the owner of the ground, unless separate ownership is evidenced in the conveyance record of the parish in which the immovable is located." *Carriere*, 702 So.2d at 653 (citing La. Civ. Code art. 491).

Buildings constructed on the land of another with the landowner's consent belong to the person who constructed them. La. Civ. Code art. 493 (citing, in the Official Comments, the example of a lessee constructing a building on a lessor's land). However, when an owner of such buildings no longer has the right to keep them on the land of another - such as at the expiration of its ground lease - he must remove them. "If the owner of such buildings . . . fails to timely remove them, the owner of the ground acquires ownership of [them] with no obligation to compensate the former owner." *Id.* at 666; La. Civ. Code arts. 493, 2695 (describing the additional notice requirement for this "appropriation" to occur without compensation); *see also, Prados v. South Central Bell Tel. Co.*, 329 So.2d 744, 746 (La. 1976).

When a lease provides that, "at the expiration of this lease . . . the title to all improvements . . . shall . . . be vested in the Lessor," then "ownership . . . is vested in the lessee until such time as the lease expires, is cancelled or terminated at which time title

10

becomes vested in the lessor." *Schulingkamp v. Heaton*, 455 So.2d 1181, 1182 (La.App. 4 Cir. 1984). It is therefore not inconsistent with a lessor retaining fee ownership to also refer to a tenant as the "owner" of the improvements for the duration of the lease.

The law relative to mortgages is set out in La.Civ.Code arts. 3278-3337. A mortgage is "an indivisible real right that burdens the entirety of the mortgaged property and that follows the property into whatever hands the property may pass." La. Civ. Code art. 3280. A lessee may mortgage his leasehold interest, his "rights in a lease of an immovable with his rights in the buildings and other constructions on the immovable." La. Civ. Code art. 3286(4); *Carriere*, 702 So.2d at 666-67 (discussing the various ways a lessee may mortgage his leasehold interest).

A lessee may also mortgage its interest in an immovable improvement apart from its leasehold interest in the ground on which it stands. However, "a conventional mortgage may be established only by a person having the power to alienate the property mortgaged," La. Civ. Code, art. 3290, and a party "[can]not mortgage a greater interest or better title than he possesse[s]," *E.g., Newman v. Cooper*, 46 La.Ann. 1485, 1494 (La. 1894). So, a party "[can] not mortgage property it [does] not own," and a party's mortgage of title greater than it owns is a nullity vis-a-vis the fee owner. *Seybold v. Fidelity & Deposit Co. Of Maryland*, 17 So.2d 841, 843 (La.App. 1944); *see also, Major v. Major*, 671 So.2d 571, 580 (La.App. 4 Cir. 1996); *St. Landry Loan Co. v. Etienne*, 227 So.2d 599, 600 (La.App. 1969). Consequently, while a lessee may mortgage its interest in immovable improvements apart from its leasehold interest in the ground, if the lease provides that at the termination of the lease title to the improvements vests in the lessor,

11

then it possesses no interest extending beyond the lease and, at termination, fee title vests in the lessors free of the mortgage. *Id*; *see also*, *Carriere*, 702 So.2d at 668, fn. 13 (rejecting a mortgagee's argument that a lease was terminated prior to its foreclosing on the improvements because "if such a termination had occurred prior to the foreclosure, ownership of the building would have vested in the [lessor].").

Recordation of a mortgage "has only the effect given it by legislation. It is not evidence of the validity of the obligation that the encumbrance secures. It does not give the creditor greater rights against third persons than he has against the person whose property is encumbered." La. Civ. Code art. 3320(C).

## II. ISSUE 1: OWNERSHIP OF THE HOTEL TOWER AND PARKING LOT

### A. Background & Parties' Arguments

The City contends that it is and always has been the fee owner of all the immovable improvements on the property. Doc. 14, p. 12. It argues that improvements presumptively belong to the owner of the ground on which they sit unless separate fee ownership is evidenced in the property registry, and no such evidence is presented here. *See*, La. Civ. Code art. 491.

Capital One contends that the City owns only the land on which the improvements sit, and that Debtor and its predecessor lessees have always been the fee owners of the improvements. Tr., doc. 3-44, p. 26 ("The City never had [title to the hotel tower].") It argues that buildings and other immovable improvements constructed on the land of another with the landowner's consent belong to the person who constructed them. *See*, La. Civ. Code art. 493. It therefore claims that at the moment of the

12

improvements' construction they were owned by the tenant, and this title was conveyed to Debtor with its assignment of the leasehold.  Doc. 12, p. 20 ("Debtor owned the Hotel Tower and Parking Lot as a result of acquiring the title to the Hotel Tower and Parking Lot . . . held by . . . the original lessee. . . . [Its] ownership of the Hotel Tower and Parking Lot but not the land is evident from an analysis of the original Ground Lease dated February 28, 1983.") (internal punctuation omitted).

Consequently, Capital One claims, the mortgage it was granted by Debtor was in the hotel tower and parking lot in fee, and its mortgage survives regardless of any rejection or termination of the lease by the City.  Doc. 12, pp. 8-9.  It thus implicitly acknowledges that if Debtor owned the buildings not as fee owner but only subject to the continued existence of the leasehold, then its mortgage would be extinguished by the termination of the lease.  *See*, La. Civ. Code art. 3319 ("A mortgage is extinguished: (1) By the extinction or destruction of the thing mortgaged [and] (7) When all the obligations, present and future, for which the mortgage has been established have been incurred and extinguished.").

The parties agree that the improvements were originally constructed pursuant to the plans laid out in the 1983 lease, and that the property has been governed by this lease and/or its amendments ever since.  Doc. 12, p. 15; Doc. 14, p. 12.

**B. Bankruptcy Court's Findings as to Ownership, & Analysis**

At the summary judgment hearing, the Bankruptcy Court rejected Capital One's claim that Debtor was the fee  owner of the improvements.  It instead ruled for the City that Debtor held title only subject to the continued applicability and terms of the lease,

13

and the City's fee ownership was unencumbered apart from Debtor's and Capital One's

interest in the leasehold.  It based these conclusions on various observations from the

lease and title record.  We affirm the Bankruptcy Court as to this issue, adopting and

supplementing its observations and findings as described below.

*1. Ownership under the 1983 lease - "a lease with an option to purchase"*

First, the Bankruptcy Court found that the 1983 lease agreement did not give the

tenant fee ownership over the hotel tower and parking lot; instead, it gave the tenant "a

lease with an option to purchase" such an ownership in these improvements.  Tr., doc.

3-44, p. 27.  It referenced four provisions of the lease in particular to support this finding.

One, that:

> Title to Tenant's Project . . . shall be in tenant, its successors, assigns, or
> sublessees **until the expiration or earlier termination of this Lease**.

Doc. 13-5, p. 7, para. 4, sec. a (emphasis added).  Two, and similarly, that:

> The improvements . . . constructed, installed, or placed by tenant in, to, or
> on the Demised Premises, other than Tenant's Equipment and Trade
> Fixtures, which Tenant has the right to remove, **shall become the property
> of Landlord at the expiration or earlier termination of this Lease unless
> Tenant exercises its option to purchase as provided in <u>paragraph 48</u>**.

Doc. 13-5, p. 8, para. 7, sec. e (emphasis added; underline in original).  Three, the

referenced paragraph 48, entitled "<u>Tenant's Option Rights</u>", that:

> So long as Tenant is not in an uncured default hereunder, Tenant shall have
> the right to, at any time . . . purchase the Demised Premises and all
> Improvements and appurtenances thereto. . . . Tenant's failure to conform
> strictly to the schedules . . . shall not void or alter Tenant's right to this
> option or its rights to acquire fee title to the Demised Premises.

Doc. 13-5, p. 23, para. 48.  Finally, it referenced para. 15, secs. a, d, which gives Tenant

the "right to mortgage its leasehold estate created hereby," but makes no mention of a

14

similar right to mortgage any separate ownership interest in the improvements. Doc. 13-5, pp. 12-13; Tr., doc. 3-44, pp. 27-31.

The Bankruptcy Court found that, under these provisions, the lessee did not own fee title to the improvements and instead only owned an interest that would extinguish at the end of the lease. Fee ownership thus ultimately lay not in the lessee but in the City, until and unless the lessee would exercise its option to purchase. Absent the exercise of that option, any mortgage granted by the lessee is not in the improvements in fee and is only enforceable subject to the continued applicability and terms of the lease. We agree with this conclusion.

Capital One's alternate reading, by which it claims lessee held fee title even without exercising its option to purchase, does violence to the plain terms of the lease. For instance, the lease expressly provides that "[t]he improvements . . . other than Tenant's Equipment and Trade Fixtures . . . shall become the property of Landlord at the expiration or earlier termination of this lease unless Tenant exercises its option to purchase." Doc. 13-5, p. 8, para. 7, sec. e.[8] This provision is consistent with the passages noted by the Bankruptcy Court above, all of which permit the lessee to retain title to its movable improvements after the termination of the lease but condition its retention of title to the immovable improvements - the hotel tower and parking lot - on the lessee exercising its option to purchase. Capital One's position to the contrary, that Debtor owned the improvements in fee or otherwise could have mortgaged the City's

---

[8] Similarly, the preceding section, para. 7, sec. d, provides that "At the expiration or termination of this Lease, Tenant shall have the right to remove Tenant's Equipment and Trade Fixtures," while making no mention of a similar right to remove or be compensated for its loss of the improvements. Doc. 13-5, p. 7.

15

future title interest without owning it, is irreconcilable with these provisions and the basics of Louisiana property law.

Likewise, the option allows the lessee to "purchase the Demised Premises and all Improvements and appurtenances thereto." Doc. 13-5, p. 23, para. 48. As the Bankruptcy Court noted, this term makes no sense if lessee is already the record owner of the improvements.

Finally, we note that this understanding is reinforced by the lease's own definition of its terms. Specifically, it defines the "Demised Premises" to be: "A certain tract . . . of land, together with all buildings, additions and improvements hereafter located thereupon . . . including all immovables by nature, destination, or declaration, hereafter forming a part of" the parcel. It defines "Improvements," to consist of both the "Landlord's Project and Tenant's Project," and it defines the latter to include the "hotel and parking area." Doc. 13-5, pp. 1-3, para. 1, secs. d, x. Finally, the lease provides that "Landlord hereby leases and demises the Demised Premises to Tenant, and Tenant hereby leases the Demised Premises from Landlord, upon the terms and conditions contained in this Lease." The lease thus plainly defines the Demised Premises to encompass the entire property, including the improvements at issue here. It leases that property to the lessee for the duration of the lease and the option to purchase the Demised Premises gives the lessee the option to purchase fee title to the land and its improvements. This structure thus confirms the reading of the Bankruptcy Court and is inconsistent with the position of Capital One that Debtor was intended to take fee ownership of its project upon its construction.

16

In all, we agree with the Bankruptcy Court that the alternate reading of Capital One is possible under Louisiana law but has no basis in the language of the 1983 lease. That document obviously created a lease with an option to purchase. There is no evidence that the parties intended to vest fee ownership in the lessee, and this alternate arrangement can only be imposed by doing violence to the plain meaning of many provisions and terms.

*2. No "missing link" - no evidence in the Title Record that the option was ever exercised or ownership otherwise vested in or transferred to Debtor or its predecessors*

The Bankruptcy Court based its conclusion, second, on the premise that under Louisiana law improvements to a leasehold presumptively belong to the owner of the land on which they sit absent some document in the title record to the contrary, and apart from Capital One's discredited claim that the 1983 lease vested Debtor's predecessor lessees with fee ownership from the beginning, no other such "missing link" exists. Tr., doc. 3-44, pp. 51-52 ("[S]omething was built on the land, which is under Louisiana law presumed to be the property of the landowner unless otherwise provided, and, in fact, the 1983 lease itself says . . . at the conclusion of the lease, if everything is in order, the tenant can buy the hotel. And it didn't. That's the problem."), p. 47 ("I just can't find that missing link from . . . the 1983 lease, and if there, if that missing link was there I think you'd have a really good case and then since it's not, when you [Capital One] recorded your mortgage I think you got a problem." ); p. 49 ("I just keep looking for that missing link and I can't find it."); p. 31 (after the lessee did not exercise its option under the 1983 lease, "there is not a deed . . . in favor [of Debtor] saying, 'Here's my

17

owner's title policy.  I convey my interest in this tower . . . to tenant, or its assignee, in accordance with the option set forth in the lease.'").

We have independently reviewed the title record in the property registry, the entirety of which is part of the Record here, and we agree with the Bankruptcy Court's conclusion.  The Record contains no evidence that the 1983 option was ever exercised, and there is no other document indicating that fee ownership was ever transferred to or vested in Debtor or its predecessors.

*3. Capital One's best argument - a single sentence in the 1991 amendment - is unconvincing*

Capital One argues to the contrary that the 1991 amendment to the lease speaks of the Tenant as the "owner" of the hotel tower and parking lot, and that this confirms its interpretation that the original lessee was the fee owner of the improvements after it constructed them under the 1983 lease.  Capital One refers specifically to the 1991 amendment's definition of "Tenant's Project: A hotel and parking area *owned* by Tenant including Tenant's equipment and trade fixtures."  Doc. 13-6, p. 3, para. 1, sec. k (emphasis added).

The Bankruptcy Court explicitly considered and rejected this argument at the hearing, for two reasons.  *See*, doc. 3-44, pp. 52-53.  For one, the rest of the 1991 amendment does not support this interpretation.  Specifically, the lease still limits this ownership to the duration of the lease; as the Bankruptcy Court points out, the lease "also says that at the end of the lease the property reverts to the landlord."  Doc. 3-44, p. 53 (referencing para. 8, sec. a: "At the expiration or termination of this Lease, Tenant

shall deliver the Demised Premises, the Improvements located thereon and Landlord's equipment and trade fixtures to Landlord. . ."). Whatever the lessee's ownership interest for the duration of the lease, therefore, it did not own an interest extending past the end of the lease, and thus it could not have granted a mortgage that does so. *Schulingkamp*, 455 So.2d at 1182; *Carriere*, 702 So.2d at 666-67.

Two, this is the only document which speaks of the lessee as the owner.  It is at best ambiguous on the point, but even were it clear it would be insufficient to establish ownership.  As pointed out, the terms of the 1983 lease are clear that the lessee did not own the improvements in fee, or otherwise past the duration of the lease absent its exercise of its option to purchase.  This provision adds no new gloss that would alter that reading.  Thereafter, there is still no "missing link" vesting Debtor or its predecessor with title to the property.  As discussed above and pointed out by the Bankruptcy Court, without such an recorded instrument, Louisiana law will not recognize Debtor's alleged separate fee ownership of the improvements.  *Carriere*, 702 So.2d at 653 (citing La. Civ. Code art. 491).

We agree with the reasons given by the Bankruptcy Court that a single reference in the middle of one of many lease amendments amidst a title record of almost 1,000 pages to the contrary is woefully insufficient to support Capital One's claim of Debtor's ownership.  As well, we supplement the Bankruptcy Court's reasoning with two observations of our own.

First, in addition to the amendment's limiting the lessee's title to the duration of the lease, Capital One's interpretation is inconsistent with numerous other provisions.

As with the original 1983 lease, it can only be supported by doing violence to the rest of the amendment's terms.

For instance, the amendment devotes multiple paragraphs and pages - a substantial portion of only a 15 page document - to clarifying and protecting a potential leasehold mortgagee's rights under a "leasehold mortgage." *See*, Doc. 13-6, para. 10, sec. g, h ("So long as there exists any unpaid or undischarged leasehold mortgage, Landlord expressly agrees for the benefit of such leasehold mortgagee that it will not accept from Tenant a modification of this Lease, a voluntary surrender of the Demised Premises or a cancellation of this lease prior to the end of this lease without the written consent of the leasehold mortgagee.").  Meanwhile, Capital One's position that the lessee was the fee owner of the improvements and could have mortgaged a separate interest therein is not even considered.

This omission is conspicuous given that, as a matter of law and absent agreement to the contrary, a conventional fee owner mortgagee faces almost exactly the same risk as a leasehold mortgagee and requires the exact same contractual protections.  For both, if the lessee breaches and the lessor terminates the lease prematurely, the mortgagee's interest in the property is extinguished and its only recourse is to the lessee, not the lessor. The only difference is the additional notice the lessor must provide to a fee owner of the improvements before it may take title to them, and the (impossible to exercise) right that the fee owner has to remove the improvements at its own expense.  Absent agreement to the contrary, the mortgagee - of a leasehold or improvements in fee - may not even receive notice of the breach and termination until after it has occurred.

For this reason, the 1991 amendment, and the original 1983 lease before it, gave a leasehold mortgagee explicit protections, such as a right to notice of any breach and an opportunity to cure and/or find a new tenant before the lessor could terminate the lease. Capital One's position that these documents omitted such similar protections for a fee mortgagee, and failed to even mention this ownership interest at all, yet such an interest still existed and a mortgage in it was in fact granted, is unreasonable.

Similarly, the predecessor lessee to the this amendment, Alexandria Hotel Property, Inc., was also a party to the agreement, and it contracted to "assign its interest in this Amended Ground Lease to [the new lessee]" in exchange for a complete release of all its liabilities under the original lease. Doc. 13-6, paras 37-38. The assignment is express and straightforward, and the release itself comprehensive, reciting for 19 lines every possible liability Alexandria Hotel could face under the original lease and expressly absolving it of all of them. Doc. 13-6, p. 15, para. 38. That Alexandria Hotel was also the fee owner of the improvements - an obvious source of potential liability or confusion, and in any case an interest which it would have had to transfer formally and explicitly - is never mentioned. Again, Capital One's argument that such an interest existed but the parties ignored it throughout the document is patently unreasonable.

Finally, we note that this amendment defines the "Demised Premises" in the same manner as the 1983 lease, to encompass Tenant's project and its improvements. *E.g.*, Doc. 13-6, p. 1. Likewise, it provides that this entire Demised Premises is the subject of the lease: "Landlord hereby leases and demises the Demised Premises to Tenant, and Tenant hereby leases the Demised Premises from Landlord." *Id.* It provides that this

21

entire Demised Premises reverts to the City at the end of the lease, and makes no mention of a separate fee ownership of the improvements. Thus, like the Bankruptcy Court, we are convinced that the ownership arrangement under the 1991 amendment is a continuation of the 1983 lease, and we find that Capital One's reading can only be imposed through inferences that do violence to the rest of the document.

Second, we supplement the Bankruptcy Court's reasoning with the observation that the 1991 amendment's reference to the lessee as the "owner" of the improvements for the duration of the lease is not as inconsistent with the Bankruptcy Court's reading of the 1983 lease as Capital One claims. Specifically, as discussed in Part I.2 above, when a lease provides that at its expiration title to the improvements vests in the lessor, then "ownership . . . is vested in the lessee until such time as the lease expires, is cancelled or terminated." *Schulingkamp*, 455 So.2d at 1182. However, the lessee's ownership is not title in fee, and it does not prevent such title from vesting in the lessor, free from any encumbrances of the lessee, as provided at the termination of the lease.[9]

---

[9] Louisiana law treats a lessee as a 'quasi-owner' in various other ways. *See*, Palmer, *Civ. Law of Lease in La.*, § 1-2. Though under Louisiana law a lease was traditionally a purely personal contractual and personal right, the Civil Code has developed over the years such that a lessee now has many of the attributes of an ordinary owner. For instance, "certain rights of the lessee may be maintained against the world," not just against the other party to the lease contract. Palmer, at § 1-2. So, if immovable property subject to a recorded lease is sold to a third party, the sale does not extinguish the lease and the new owner may not evict the lessee. Likewise, if the lessee's peaceable possession is disturbed by a third party, the lessee has a cause of action against the person causing the disturbance, and if leased property is expropriated or otherwise purchased by a public body, the lessee may assert a claim for just compensation. *Id.* (citing, e.g., *Columbia Gulf Transmission v. Hoyt*, 215 So.2d 114 [La. 1968]). Likewise, the obligation of vicinage applies to lessees, and co-lessees of adjacent property may hold each other accountable directly as both "proprietors" and "neighbors". *Id.* (citing La. Civ. Code art. 667 and *Butler v. Baber*, 529 So.2d 374 [La. 1988]). Finally, the Civil Code now allows a lessee to bring a possessory action against anyone except the person for whom he possesses. *Id.* (citing La. Civ. Code art. 3440). In all these ways, Louisiana law recognizes a lessee as an "owner" while the lease is in effect, and that description is in no way inconsistent with it not having ultimate

This point is reinforced by other terms of the 1983 lease, which expressly provide for this arrangement. Specifically, it says plainly that "Title to Tenant's Project . . . shall be in tenant, its successors, assigns, or sublessees until the expiration or earlier termination of this Lease." Doc. 13-5, p. 7, para. 4, sec. a. It is thus not at all inconsistent with the Bankruptcy Court's interpretation for the 1991 amendment to refer to the lessee as the "owner" of the improvements, and yet for the City to remain the fee owner of the improvements, with Debtor's interest - and any encumbrance on that interest - extinguishing at the end of the lease.

As well, the lease vested the lessee with several additional rights and responsibilities often associated with ownership for the duration of the lease. For instance, lessee had the responsibility to pay property taxes, maintain insurance, and maintain the condition of the building in good repair. Doc. 13-6, p. 4; *see*, Palmer, at §§ 1-2 (describing how an ordinary lessee "is not liable for the real charges and taxes which burden the thing."), 3-6 (describing a lessee's ordinarily limited responsibility for repairs and how the duty to repair is usually associated with ownership). Likewise, lessee bore the primary risk of casualty damage or destruction, being obliged to rebuild in case of damage equal to or less than one half of the total projects, and to rebuild or demolish at his own expense in the event of greater than 50% destruction. Doc. 13-6, p. 5. Finally, lessee bore the sole liability for any injuries sustained on the property. Doc. 13-6, p. 8. In all these ways, for the duration of the leasehold, lessee indeed acted as "owner" of the buildings on the property, and referring to him as such - while clearly recording the

---

fee ownership.

23

limited duration of and the conditions on that ownership - is in no way inconsistent with the Bankruptcy Court's finding that the City and not Debtor held title to the improvements in fee.

*4. The rest of the title abstract is crystal clear*

In addition to the 1983 lease and its 1991 amendment, all of the other documents in the title registry support the Bankruptcy Court's ruling and contradict the position of Capital One.

First, as the Bankruptcy Court observed, all of the amendments to the lease, including those of 1991, 1996, and 2003, provide that "[t]he improvements situated on the leased premises revert to the fee owner at the expiration of the lease," a condition patently inconsistent with the idea that the lease vested the lessee with fee ownership. *See*, Doc. 3-34, p. 13; Tr., doc. 3-44, p. 36, p. 39 ("[E]very place . . . we have the reversion clause."). Indeed, the 1996 deed under which Debtor's immediate predecessor acquired its interest provides that its assignment was "subject to the following title exceptions: . . . 2. The improvements situated on the leased premises revert to the fee owner at the expiration of the lease." In contrast, none of the other lease amendments contain the "tenant as owner" language from the 1991 amendment that Capital One cites to support its position. These documents thus do not support an inference that Debtor ever owned or acquired fee ownership, or any other interest in the property that would outlast its interest in the leasehold.

Indeed, Capital One's own mortgage contains exactly such a clause recognizing the limits of Debtor's title. The "Legal Description of Immovable (Real) Property"

24

attached to and referenced by the 2003 mortgage Debtor granted to Capital One says explicitly that, "[t]he improvements situated on the leased premises revert to the fee owner at the expiration of the lease." Doc. 3-35, p. 18, para. 1; Tr., doc. 3-44, p. 54 (Bankruptcy Court telling Capital One that "your own mortgage says it, that [the disputed property] reverts to the landlord."). The rest of the mortgage does not contradict this arrangement, describing "the immovable (real) property" that is the subject of the mortgage with "SEE ATTACHED EXHIBIT," referencing the above description. Doc. 3-35, p. 2. Accordingly, even the document on which Capital One bases its current claim provides that Debtor was not the fee owner of the property, and that its interest - and thus any mortgage it granted in that interest - would extinguish at the end of the lease. For Capital One to claim otherwise now borders on the frivolous.

Third, the ordinance under which Debtor acquired its interest in the disputed property - the City's 2003 ordinance authorizing the Mayor to negotiate and strike a new lease with Debtor - also authorized the Mayor to sell the hotel. As the Bankruptcy Court noted, "if the City had already divested itself of the hotel, why would the Mayor need to be authorized to sell it in 2003?" Tr., doc. 3-44, p. 42. Notably, though the ordinance was on the property record and would have directly challenged Debtor's claim to fee ownership, Debtor never protested this or any of the other documents discussed above. *See*, docs. 13-8 to 13-10.

Fourth, like the 1991 amendment, the Estoppel Certificate accompanying the 2003 assignment whereby Debtor acquired its interest spent five pages describing

25

protections for a potential leasehold mortgagee, yet it provided no such protections for a fee mortgagee, and in fact never even contemplated that such a mortgage could exist.

As discussed above, this fact is incredible on its face, but it is even more so here given that concurrently with the estoppel certificate Debtor was allegedly granting just such a mortgage in its fee interest to Capital One–the estoppel certification and mortgage were signed the same month, December 2003.  Capital One's position thus demands that we find that at the same time Debtor was negotiating a mortgage in its fee ownership, it was negotiating comprehensive protections for a potential leasehold mortgagee that ignored the main part of the mortgage it was about to obtain.  That position is irrational.

To reiterate, we concur with the Bankruptcy Court in finding that the position of Capital One is uniformly contradicted by the rest of the documents in the title registry. The one exception to this observation could be Debtor's Schedule A - Real Property filing in the bankruptcy case, where Debtor listed a "Leasehold interest in land and ownership of buildings known as Alexandria Fulton Hotel."  This is not actually part of the property's title record, is ambiguous as to what it means by ownership, and was in 2008, long after the relevant document transferring ownership.  It thus holds little if any legal significance, and the Bankruptcy Court neither accepted nor lingered on the content of this mistake, nor did it base any findings or conclusions upon it.  However, we note it to clarify the Record below, as the City claimed otherwise at the summary judgment hearing and was not contradicted.  Doc. 3-44, p. 38 (counsel for the City asking

26

rhetorically, if Debtor owned the improvements, "[w]hy did debtor's schedule not list" this ownership?).

*5. Conclusion*

For the reasons discussed above, we affirm the Bankruptcy Court's findings and conclusion as to the fee ownership of the hotel tower and parking lot. The 1983 lease granted Debtor's predecessor lessee a lease with an option to purchase, which option was never exercised, and every subsequent amendment and document in the title registry confirms this interpretation. No chain of title exists conveying fee ownership or any other interest to Debtor that would survive the lease, and it thus could not have mortgaged such an interest to Capital One. Ergo, any interest Capital One holds today exists subject to the continued application and terms of the lease.

**C. The Bankruptcy Court Finding that Summary Judgment is Appropriate**

In addition to challenging the content of the Bankruptcy Court's conclusion, Capital One contests whether summary judgment was appropriate at all–it claims it was not because of "the existence of many genuine issues of material fact." Doc. 12, p. 5. We agree with the Bankruptcy Court that no such facts exist and summary judgment on the ownership issue was and is appropriate.

*1. Capital One's affirmative defenses are irrelevant as to this issue*

In its brief, Capital One argues that "the affirmative defenses pled by Capital One present many such" disputed issues of material fact, and it highlights in particular those defenses "based on estoppel, the City's unclean hands, and the City's intentional misrepresentation and/or negligent misrepresentation." Doc. 12, pp. 9, 25. Specifically,

27

it claims that the City has dealt with it dishonestly since Debtor began to encounter financial difficulties. It alleges that, after Debtor's breach, the City induced Capital One not to take steps to protect its mortgage rights in the leasehold by promising not to seek the lease's termination, when it actually intended to do so.

The weakness of Capital One's position is that none of its allegations, even if proven true, would change the resolution of the ownership issue. Either the City or its lessee owns the improvements under the 1983 lease and its amendments. This question was and is resolved by the relevant documents in the title registry, not the parties' recent behavior as alleged by Capital One.

More specifically, for summary judgment to be inappropriate, Capital one would have to allege genuine issues of material fact, i.e., some fact or facts that, if true, would change our resolution of this issue by showing either that the lessee and not the City owned the property in fee under the 1983 lease, or that the City's ownership interest has since been conveyed away in a chain of title that leads to Debtor. For instance, it could argue that the option to purchase in the original 1983 lease actually was exercised, or that the title record is otherwise incomplete and a trial is needed to prove or discern the significance of an alleged missing agreement or document.

Capital One does not make any such argument. Instead, it alleges facts about the parties' recent behavior that could be relevant to the question of whether the lease - and thus Capital One's mortgage in and under the lease - continues to exist, but that are irrelevant to the question of fee ownership and encumbrance apart from the lease.

28

Accordingly, we affirm the Bankruptcy Court's finding that none of Capital One's allegations prevent ruling on summary judgment as to this issue.

2. *The issues Capital One raises are entirely questions of law*

In addition, at the Summary Judgment hearing Capital One argued that the alleged ambiguity of the documents in the title record alone make summary judgment improper. It suggested that "if the documents are inexact, then it's not appropriate for summary judgment and you [should] bind it over for trial." Tr., doc. 3-44, p. 51.

The court replied "No. . . . I don't think they're all that murky. I think they're very, very clear." Doc. 3-44, p. 51.

We agree with the Bankruptcy Court as to the clarity of the lease and other documents in the title record.

In addition and in the alternative, we affirm the Bankruptcy Court's decision to grant summary judgment on the grounds that, even were the lease ambiguous, contractual interpretation is a question of law, and resolving ambiguity is an entirely appropriate task for summary judgment.

This is particularly true when, as in the present case, the parties have had ample opportunity to develop their arguments as to that interpretation for the Record. The adversarial proceeding giving rise to the present action came after a lengthy bankruptcy proceeding where the only major asset was the property at issue here. Its ownership is thus almost the sole topic of an extensive Record, on which the adversarial proceeding, the Bankruptcy Court's order, and our decision here are based. In addition, the Bankruptcy Court held a full hearing before granting summary judgment, almost all

of which focused on the issue of interpreting the lease and other documents in the title record regarding the disputed property's fee ownership.

In short, in all respects, the Record was more than sufficient to justify the Bankruptcy Court's decision here.

## D. Conclusion

We concur with the Bankruptcy Court's finding that the 1983 lease was self-evidently a lease with an option to purchase, which option was never exercised.  All subsequent documents in the title record confirm this arrangement, with even Capital One's mortgage explicitly acknowledging that Debtor would not retain title after the lease's expiration. Under Louisiana law, a property interest which comes to an end after a period set forth in a contract is a lease; no other Louisiana property estate, and certainly not fee ownership, is consistent with this arrangement.

Capital One can only cite to one line in one document, the reference to it as the "owner" of the improvements in the 1991 amendment, suggesting otherwise. We agree with the Bankruptcy Court that this is insufficient to vest fee ownership in Debtor in the face of a complete title record to the contrary, and absent any chain of title or "missing link" conveying the property from the original lessee to Debtor.  We also find that, considering the rights granted to lessee in the lease, referring to the lessee as the "owner" of the improvements for the duration of the lease is not as inconsistent as Capital One claims.

Finally, we agree with the Bankruptcy Court that the title record is "crystal clear" as to these issues and Summary Judgment was and is appropriate.  Regardless,

30

interpreting ambiguous contractual language is a matter of law and a task well within the province of a court ruling on Summary Judgment, particularly when the Record has been developed by an entire prior proceeding and full hearing on the issue.

Accordingly, we here resolve the following of Capital One's appellate issues, that the Bankruptcy Court did not err by:

- (1) granting Summary Judgment as to the ownership issue;

- (4) concluding that Capital One's borrower never owned the Hotel Tower, Parking Lot, and Related Assets in fee;

- (6) instead concluding that the City is the owner in fee of these assets; and

Further, we resolve the following issues in part - only as they relate to the party's alleged interest in the assets in fee - and affirm the actions ordered by the Bankruptcy Court insofar as they are not inconsistent with our finding that the Bankruptcy Court did not err by:

- (5) concluding that Capital One never held a mortgage in these assets apart from its interest in the leasehold;

- (7) ruling that the City possesses all right, title, and interest to these assets apart from Capital One's interest in the leasehold;

- (8) ordering the Clerk to partially cancel Capital One's 2003 Mortgage as it relates to and encumbers these assets, apart from its mortgage in the leasehold;

- (9) granting Summary Judgment as to the ownership issue without considering and determining the merits of each of Capital One's affirmative defenses;

- (13) partially sustaining the City's objection to Capital One's proof of claim and canceling and terminating Capital One's 2003 Mortgage on the Hotel Tower, Parking Lot, and related assets, except insofar as Capital One may retain an interest in these properties by virtue of its  mortgage in the leasehold, as discussed below.

## III. ISSUE 2: THE BANKRUPTCY COURT'S TERMINATION OF THE LEASE AND THE PARTIES' CONTINUING RIGHTS AND OBLIGATIONS, IF ANY, THEREUNDER

The other major topic at summary judgment was the Bankruptcy Court's ruling that the lease was terminated, the parties retained no further rights under the lease, and the City was now free to lease the property to a new party unencumbered by its prior lease.  For the reason that the grounds for termination are to us unclear and the Record otherwise insufficient to support the Bankruptcy Court's ruling, we vacate that ruling and the actions ordered to effectuate it, and we remand the case to the Bankruptcy Court for further findings on this issue.

### A. Additional Legal Standards

As the parties now accept, a deemed rejection of a lease pursuant to § 365(d) of the Bankruptcy Code does not automatically effect that lease's termination, and security interests in the leasehold survive and are not automatically extinguished by this rejection.  *In re Austin Dev. Co.,* 19 F.3d 1077, 1081-83 (5th Cir. 1994) (holding a lease's deemed rejection does not effectuate its termination, in part specifically because "the most adverse consequences [of termination] . . . are reserved for the third-party mortgagee," a result which the Court calls "capricious" and without rationale under §

32

365).  Instead, parties' rights post-rejection are governed by the terms of the lease and ordinary principles of state law, in this case the Louisiana law of Obligations and Property.

Louisiana law recognizes the third-party beneficiary doctrine.  *See*, La. Civ. Code art. 1978 ("Stipulation for a third party").  Post-rejection, nothing in the Bankruptcy Code prevents a third-party beneficiary mortgagee in the leasehold from maintaining an action against the lessor to protect its security rights, if any.  *Id.*, at 1083-84.

## B.  Analysis - the Bankruptcy Court's Ruling and Order, and the Party's Arguments

In Count One of its complaint, the City sought cancellation of the lease in the public records on the basis of the Court's July rejection order, as discussed below.  The Bankruptcy Court's grant of summary judgment as to this count did not explain the legal basis for its grant, or for termination in general.  It only ruled that the Bankruptcy Court's earlier order be reinstated and that the lease is therefore terminated.

Prior to the adversarial proceeding, there had been no separate order terminating the lease.  Instead, the Court had issued two orders regarding the lease, in July 2009 deeming the lease rejected, and in September 2009 that the Clerk cancel it on the public record "in furtherance of" the rejection.  The rejection order was not appealed and is accepted by the parties as final.  The cancellation order was immediately challenged and, through the adversarial proceeding, is one of the issues before us today.

At the summary judgment hearing, the Bankruptcy Court issued findings regarding this issue.  These indicate that the Bankruptcy Court may have considered the lease terminated by virtue of its order deeming the lease rejected, a position originally

33

advanced by the City but now correctly accepted by the parties to be incorrect.  The Bankruptcy Court referred on three separate occasions to "the NR lease, which this Court held was terminated which order is final and which order was not appealed," the rejection order being the only order concerning the lease which was not appealed. Likewise, the Court explained that "I think the judicial cancellation, ex parte though it may have been, is entirely appropriate. ... It ordered that lease terminated.  That order is final and not appealed.  Once that was the case, then there's no particular reason for the Court not to be able to order the Clerk ... to clean up its records to reflect the Court's ruling."  This reasoning seems to reflect an incorrect understanding of the legal effects of the orders, with the first order deeming the lease rejected also terminating it, and the following order canceling the lease on the public records merely reflecting what was already a judicial reality.

On the other hand, given that they now accept a correct view of the law, the parties, and particularly the City, argue a different basis for termination here, that the parties' actions post-rejection have effected the lease's termination - and the extinguishing of Capital One's security rights - by operation of the terms of the lease. Whether this argument has merit is not an appropriate topic for decision by this Court today.

The main reason such a decision would be inappropriate is that the Bankruptcy Court made no findings in support of this position below, and the parties did not present full arguments to us about these issues on the appeal.  Our resolving it would thus demand that we make original findings of fact and judgments about the meaning of the

34

lease that are outside of this Court's appellate purview.  These questions must therefore first be answered by the Bankruptcy Court according to the normal procedures of an adversary proceeding.

More specifically, at the summary judgment hearing the Bankruptcy Court made no statement claiming to terminate the lease on a post-rejection basis, and it made no findings with regards to the parties' post-rejection behavior, either legally about what the lease demanded of them or factually about what the parties had done.  For instance, it did not resolve the issue of whether the estoppel agreement is binding on the parties, whether Debtor and Capital One satisfied the lease's requirements to avail themselves of its protections, or whether other provisions of the lease, such as those in the original 1983 agreement and its 1991 amendments, may provide similar protections.  *See*, *e.g.*, Doc. 13-6, p. 8, para 10(g) of 1991 amendment ("So long as there exists any unpaid or undischarged leasehold mortgage, Landlord expressly agrees for the benefit of such leasehold mortgagee that it will not accept from Tenant . . . a voluntary surrender of the Demised Premises or a cancellation of this lease prior to the end of this lease without the written consent of the leasehold mortgagee.").  It likewise did not resolve what the lease required of the City qua notice, timelines, and opportunities to cure before the lease would be terminated, including whether any of the timelines were or have been suspended in the course of the present proceedings.  *See*, *e.g.*, Doc. 13-10, p. 3, sec. E, para. 4 of Estoppel Agreement (providing that if Capital One is prevented from foreclosing on its interest by an ongoing Bankruptcy proceeding, then its time to cure is extended).

It also made no findings of fact with regard to the parties' recent actions, both as to whether the City complied with the requirements, if any, in the lease, and whether Capital One's responses, if any, were enough to protect its security interests in the face of those actions. Therewith, it did not address Capital One's affirmative defenses, which, it argues, raise at least colorable defenses as to this issue. One is whether, for example, the alleged agreements between Capital One and the City possibly constitute a waiver of certain lease terms, an implied modification of the lease, a new or side agreement, or an election of remedies. Indeed, the Bankruptcy Court did not even address the basic issues of its continuing, post-rejection jurisdiction and, as specifically objected to by Capital One, the standing of each party to participate in the proceeding.

To the contrary, the Bankruptcy Court acknowledged multiple times that those issues remained unresolved, declaring that, "there are a number of events we never decided. We punted in the bankruptcy case." It also specifically ruled that the issues Capital One raised in its defenses about why it had allegedly failed to exercise its rights "are not quite before me," because it was holding the lease terminated on the basis of its earlier rejection order.

The paucity of the Record as to this issue is in contrast to the ownership issue, discussed above, where the Bankruptcy Court considered all of the documents and their various possible meanings in detail, and issued extensive findings as to the basis of its ruling.

The City has attempted in its recent filings to construct a plausible time line supporting termination under the terms of the lease. However, the time line is self-

36

contradictory, showing, for instance, the City moving the Bankruptcy Court to declare the lease terminated before the time period after which it now claims the lease was terminated had lapsed. Also, it is less than clear based on our review of the documents which the City cites that events transpired exactly as its timeline now claims. More importantly, it is inappropriate for us to resolve this and the other issues discussed above in the first instance here–the City should assert its timeline on remand, where Capital One can respond and the Bankruptcy Court can receive evidence and arguments.

## C. Conclusion

Accordingly, for the reasons given above, we vacate the Bankruptcy Court's order deeming the lease terminated; its reinstatement, pursuant to Count One of the complaint, of its order of September 18, 2009, declaring the City's title free of any leasehold mortgage(s) or other encumbrances relating thereto; its cancellation of Capital One's Proof of Claim based on any such mortgage(s); and its order that the Clerk of Court take various actions to effectuate this aspect of its ruling. Instead, we remand the case to the Bankruptcy Court for further proceedings on the lease termination issue not inconsistent herewith.

## IV. Remaining issues

The above satisfies most of Capital One's remaining issues. For completeness, those not addressed above explicitly are addressed as follows:

First, as to its claim that the Bankruptcy Court erred by not specifically addressing each of its affirmative defenses, to the extent that these defenses are relevant to an issue on this appeal, we discuss them above. As to its more general claim that a failure to

37

address all defenses regardless of merit or relevance is reversible error, we disagree, and we note that the single, unreported District Court case from New Jersey that it cites,[10] upon closer examination, fails to actually support its position. Capital One cites no law actually holding that a Bankruptcy Court must or may be reversed if it does not specifically address all of a party's affirmative defenses in an order for summary judgment, and we found none here.

Second, Capital One argues that the Bankruptcy Court separately erred by not addressing the security rights in the property it received from Debtor to provide Debtor in Possession financing. This claim is likewise unfounded, as Debtor could only grant as great a security interest as it owned, as explained above. To the extent that Capital One seeks a declaration of the primacy or seniority of its legitimate claims, if any, secondary to having provided this financing, we note that the Bankruptcy Court did not address or foreclose this issue in its ruling, and we consider it a potentially live controversy for further adjudication, on remand in the adversarial proceeding, or in the main bankruptcy case, as appropriate.

Finally, the City contests the standing of the trustee to challenge the termination of the lease. The Bankruptcy Court made no specific ruling on this issue. We note that, generally, "after rejection the debtor's estate ha[s] no remaining interest in the outcome" of controversies regarding the continuing applicability of a rejected-but-not-terminated lease, including a lessor's and a third-party beneficiary's continuing rights and obligations thereunder. *In re Austin Dev. Co.,* 19 F.3d 1077, 1084 (5th Cir. 1994). As we

---

[10] *Central Lewmar, L.P. v. Gentilin,* 2005 WL 1308235 at *6 (D.N.J. 2005).

vacated the Bankruptcy Court's ruling on this issue, we hold any ruling it implicitly made on this issue to be likewise vacated and an appropriate topic of adjudication on remand.

Accordingly, except as discussed above, we find no error by the Bankruptcy Court with regard to any of these issues raised by Capital One.

FINAL

For the reasons discussed above, we partially AFFIRM and partially VACATE the Bankruptcy Court's grant of summary judgment as to all three counts.

Accordingly, the portions of the Court's Summary Judgment ruling recognizing the City's fee ownership, including that this ownership is unencumbered except by the possible continued applicability of the lease and the parties' interests therein, are AFFIRMED.

We VACATE those portions of the Bankruptcy Court's ruling deeming the lease terminated, including its orders to cancel the lease in the public record and/or Capital One's mortgage relating to it, and we REMAND the case to the Bankruptcy Court for further proceedings on this issue not inconsistent herewith.

SIGNED on this 26th day of October, 2010, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE
